Burks, J.,
delivered the opinion of the court.
When Henry W. Hey (the plaintiff in error here) was on trial in the court below, before any evidence had been introduced, the attorney for the commonwealth asked that all of the witnesses should be sent from the court room, and no objection being made by the prisoner, this was ordered by the court, and all of the witnesses then sworn for the commonwealth, and the witnesses for the prisoner, were sent out, except Police Justice White, who, by consent of counsel on both sides, was allowed to remain. Afterwards, when evidence had been introduced tending to show that the prisoner obtained the goods mentioned in the indictment from one Augustus Byers, who had been arrested, as stated in the bill of exceptions, for the larceny of said goods, and was then in the prisoner’s box in the court room, held on a requisition from the governor of North Carolina, the attorney for the commonwealth called said Byers, and asked that he be sworn as a witness for the commonwealth, but the counsel for the prisoner objected, *948 on the ground, (and for no other cause), that Byers had 0 v ' v remained in the court room,-and had not been-sent out the other witnesses. The objection was overruled. ‘an¿[ the prisoner by.counsel excepted. This action of the . . -j court is assigned as error.
In the trial of causes, both civil and criminal, it is a rule of practice devised for the discovery of truth and the •detection and exposure of falsehood, and well adapted to the ends designed, for the presiding judge, on the motion •of either party, to direct that the- witnesses shall be examined out of the hearing of each other. Such an order •upon the motion or suggestion of either party, it is said, ■is rarely withheld; but that, by the weight of authority, ithe party does not seem entitled to it as a matter of right. 1 Greenleaf Ev. § 432. To effect this object, generally, the respective parties are required to disclose the names of the witnesses intended to be examined, and then the witnesses are simply ordered to withdraw from the court room and warned not to return until called, or, as is sometimes the case, they are placed under the charge of an -officer of the court, to be by him kept out of .hearing in the jury room or some other convenient place, and brought ánto court when and as they may be severally needed for ■examination. If a witness or the officer in charge willfully disobeys or violates such order, he is liable to be ¿punished for his contempt, and at one time, according to the English practice, it was considered that the judge, in the exercise of his discretion, might even exclude the testimony of such a witness. But now, it seems to be the practice to allow the witness to be examined, subject to ■observation as to his conduct in disobeying the order. 2 Taylor on Ev. (7th ed.), §§ 1400, 1401, 1402; 3 Wharton’s Crim. Law (7th ed.) § 3009(a), note, and cases cited by these authors.
In Cobbett v. Hudson, 72 Eng. C. L. 11 (decided by queen’s bench in 1852), Lord Campbell, C. J., observed, *949 that with respect to ordering witnesses out of court, although this is clearly within the power of the judge, and he may fine a witness for disobeying this order, the better-opinion seems to have been that his power is limited to the infliction of the fine, and that he cannot lawfully refuse to permit the examination of the witness. Citing Cook v. Nethercote, 6 C. & P. 471 (25 Eng. C. L.); Rex v. Colley, 1 Mood & Mal. 329 (22 Eng. C. L.); Thomas v. David, 7 C. & P. 350 (32 Eng. C. L.) And in Chandler v. Horne, 2 Moody & Robinson’s Nisi Prius Cas. 423, Erskine, J., said, “ It used to be formerly supposed that it was in the discretion of the judge whether the witness should be examined. It is now settled and acted upon by all the judges that the judge has no right to exclude the witness; he may commit him for contempt, but he must be examined ; and it is then matter of remark as to the value of his testimony, that he has wilfully disobeyed the order. See also Nelson v. State, 2 Swan’s R. 237.
The rule as stated seems to have been applied to eases in which the witness had wilfully disobeyed the order of the court. Cases may arise in which a party to the suit has been guilty of such gross misconduct as to amount to a fraud upon the court and the adverse party. Suppose a case in which the court has directed an examination of the witnesses out of the hearing of each other, and has required the parties respectively to produce their witnesses before the court in order that they may be warned by the judge and ordered to withdraw, and one of the parties wilfully and fraudulently withholds the name of a witness, and purposely suffers him to remain and hear the examination of the witnesses on the other side, would he be permitted, under such circumstances, to examine that witness ? The question need not be answered, as the case here is not the case supposed. In the present case, the motion for the separation of the witnesses was made by the worthy attorney for the commonwealth. The witnesses on both sides- *950 were sworn and sent out of the court room. The witness Augustus Byers was present, but he was not then sworn sent out, as were the other witnesses. He was in legal custody, and of course could not absent himself. But he * might have been sent out in charge of an officer. This should have been done, if it was intended to examine him, for, of all the witnesses, it was most important to the prisoner that this witness, then in custody under a charge of larceny of the goods in question, should not have been permitted to hear the statements of the other witnesses, who were examined before he testified. His name appears at the foot of the indictment as one of the witnesses sworn and sent by the court to the grand jury to give evidence. It may be, that the attorney for the commonwealth was not aware of the presence of Byers in the court room while the other witnesses were under examination, or perhaps at the time he made the motion to send the witnesses out it was then his purpose not to examine him as a witness, and he may have considered it necessary to examine him after hearing the testimony of the other witnesses. Under the circumstances, we do not think the court erred in refusing to exclude this witness, his presence during the previous examination of the other witnesses being open to observation, and a matter to be weighed in determining the value of his testimony.
The only remaining assignment of error is the overruling of the prisoner’s motion to set aside the verdict of the jury and grant him a new trial, on the ground that the verdict was contrary to the law and the evidence.
The prisoner was prosecuted under the statute (Code of 1873, ch. 188, § 19,) by which it is enacted that if any person buy or receive from another person, or aid in concealing any stolen goods or other thing, knowing the same to have been stolen, he shall be deemed guilty of larceny thereof, and may be proceeded against, although the principal offender be not convicted.
*951 To convict an offender against this statute four things must be proved. 1. That “the goods or other things” were previously stolen by some other person. 2. That the accused bought or received them from another person, or aided in concealing them. 3. That at the time he so bought or received them, or aided in concealing them, he knew they had been stolen. 4. That he so bought or received them, or aided in concealing them, malo animo or with a dishonest intent.
The first two ingredients of the offence were clearly proved in the present case.The harness mentioned in the indictment was stolen from the owner, Frank Coxe, at Charlotte, in the state of North Carolina, some time between the 3d and 6th day of May last, and came into the possession of the prisoner, who was a junk dealer, at his storehouse in the city of'Richmond, on the 12th or 13th of the same month. If, when he received it, he knew it had been stolen, his intent, under the circumstances, must have been a dishonest one. So that the only question is, whether, when he received the harness, he knew it was stolen property. Did he have such knowledge? Certainly, there is no direct evidence that he had; that is not pretended. If guilty knowledge was established, it must have been by the circumstances proved in the case. The enquiry, then, must be into the sufficiency of these circumstances.
The prisoner received the harness from the negro, Augustus Byers, who testified in behalf of the commonwealth, and the evidence tends strongly to show that if this witness was not the original thief, he was probably his agent in disposing of the property. The harness was sent in a box, by the Richmond and Danville railroad, to Richmond, consigned to “M. H. Hayes,” and billed as “1 box clothing.” It does not appear at what point it was put on the railroad, or who was the consignor, or that the box had any directions upon it or marks indicating its contents, nor *952 wag ¡j; shown on what day it reached the Richmond depot. . . But on the 9th day of May -the freight agent of the rail-company at Richmond sent out a notice, as was thecus^om w^en goods arrived at the depo.t, addressed to “M.: H. Hayes,” advising him that there was in the depot, subject to his order and ready for. delivery, “1 box of clothing”—“freight, 75 cents.” Appended to this notice.was an order to the agent of the company directing the delivery of the article described in the notice, intended to be signed by the consignee, and a memorandum on. the margin in these words: “ No goods delivered until freight is paid- and this notice signed and returned.”
On the 11th or 12th of May (it must have been the latter day, as the 11th was Sunday), Byers appeared at the depot with the notice before described, paid the freight to the proper agent, and then presented the notice to A. T. Sumwalt, a clerk of the railroad company, for the delivery of the box. Sumwalt, seeing from the face of the paper that the freight had been paid, told Byers to take the notice back and get the receipt at the bottom of it signed. Byers then said the box was his, that he was H. Hayes, and asked Sumwalt to sign the receipt for him, which Sumwalt did by writing the name “H. Hayes,” Byers making his mark. The box was then delivered to him, and he took it to the storehouse of the prisoner, where it was. opened by him the next day and the harness taken out. It was distinctly proved that he then offered to sell the harness to the prisoner, representing that it belonged ■ to-his brother, living somewhere on the railroad, who had been keeping a livery stable and hacks, had broken up business, and had sent the harness to him to sell. That this representation was untrue, the whole record proves that it was wilfully false, is shown by his own testimony • for he says that the harness was sent-to Richmond from, North Carolina by one Lee. Foster, a colored man, and that all he did was for Foster. He does not say that he *953 gave this information to the prisoner, nor is there any evidence to that effect. He does say that he got a letter from Foster, addressed to-Hey, enclosed in an-envelope ad-dressed to him, and that he delivered that letter to Hey. He does not state, however, at what time he received the letter, or when it was delivered, whether before or after the box reached Richmond, or what were the contents of the letter, if he knew. The notice issued by the railroad company, before referred to, and upon the production of which, and the representation that he was “ H. Hayes,” the box was delivered to him, he says he got from the prisoner. How such a notice could have come to the possession of the prisoner is not explained by the evidence. It was not addressed to him, but to “ M. H. Hayes.”
It was proved by the freight agent that it was the custom of the company when goods arrived at their depot to send out such a paper or notice to the consignee or person, to whom the goods were sent; that these notices were first given to a messenger to deliver, when, if the messenger could not find the party, the notice was enclosed in an envelope addressed to the party and dropped in the postoffice;, that in this case he could not say whether the messenger delivered the notice, or who received it; that the notices, were generally sent out by a boy named Kid well; that Kidwell was out of the city, being on leave of absence. He was therefore not examined as a witness.
Again, it is singular that if the prisoner delivered this, notice to Byers he did not sign the order at the foot giving-Byers authority to receive the box. He must have known such signature to be necessary. But suppose he did receive the notice, the information conveyed by it was not inconsistent with the representation made to him by Byers, when the box was opened, that the harness it contained was the property of his brother, who lived somewhere on the railroad, and was for sale on his account: for if it is. to be borne in mind that Byers did not then, or at any- *954 other time, as far as the evidence discloses, inform the . . ' prisoner that he was acting for Lee Foster.
A circumstance much relied on by the attorney-general as showing guilty knowledge on the part of the prisoner, was the sale of the harness by him at a price grossly inadequate, as alleged. It is true that Mr. Coxe, the owner of the harness, testified that he bought it in Philadelphia in June, 1878, and gave $269 for it, together with the breast chains and lines, which, it seems, were not stolen, or at least never came to the possession of the prisoner • that he had used the harness from six to nine months, and the remainder of the time he had put it away, and that he would give $250 for it at the time of the trial.
This estimate can hardly be regarded as the fair market value of the harness. The prisoner sold it at $25 to John Kelly, a junk dealer in Richmond. He had offered to sell it to various persons at thirty-five dollars, but was unable to obtain that price. Kelly says he bought it to sell again, and did not consider it a bargain at thirty-five dollars, nor any great bargain at twenty-five dollars, as such stock was likely to lay on hand a long time before a sale could be made at a profit. He asked forty dollars for it, but would have taken less; that he had offered it for sale to several persons, among others to Mr. J. C. Smith, who was ajunk dealer, as well as a dealer in ice, and bought and used a great deal of second-hand harness. Smith offered thirty dollars for it, but he would not take less than thirty-five dollars, which Smith refused to give.
We do not think, under these circumstances, that the sale of the harness by the prisoner at the price obtained raises the presumption of guilty knowledge.
But beside the circumstances, which have been noticed as the most unfavorable to the prisoner, there are others, which seem to repel the presumption of guilty knowledge.
The man Byers, from whom the prisoner received the *955 harness had been engaged in driving a wagon on the streets of Richmond for a year or two and was known to the prisoner, to whom he had sold some second-hand harness of his own the year before the trial. Byers himself says in his testimony that the prisoner knew nothing wrong about him, nothing to cause him to doubt his honesty, nor did any one else in Richmond know but that he was honest; and when the prisoner sold the harness to Kelly, he said he would vouch for the man from whom he got it; that he knew him and he was all right. The box was taken from the depot by Byers along the public streets in the day time to the prisoner’s storehouse or shop, and there deposited. It was opened and the harness taken out in the shop in the day time, publicly and in the presence of witnesses, who testified to what was then said and done. The- prisoner being unwilling to purchase the harness at a greater price than he offered, it was left with him by Byers for sale. He keptit for at least a month before a sale was effected. In the meantime, it was never concealed or attempted to be concealed, but was exposed all the time to public view and repeatedly offered for sale to divers persons.
The circumstances adverted to, and especially this open conduct of the prisoner, do not seem to be reconcilable with the idea of guilty knowledge.
Besides, this is a case of circumstantial evidence, in which the good character of the accused deserves consideration in determining the question of guilt or innocence.
It was proved by Joseph J. White, the police justice of the city of Richmond, that he had known the prisoner since 1868; that he had always borne a good character for probity and fair dealings, very good indeed for one engaged in the hazardous busines he was engaged in; by Thomas B. White, a captain of the city police, that he had known him well for four or five years, and that he had never heard anything to cause him to doubt his honesty; *956 by James V. Reddy, that he had known him quite iutimately since 1868, and that his character for honesty had as good as any man’s; and by James M. Gregory, known him quite intimately for twelve or fourteen years, and his character for honesty had always been good, as good as any man’s, and that he had. never heard questioned by any one. bio evidence as to character was offered by the commonwealth.
After a careful examination of this case, whether the second bill of exceptions be regarded as containing a certificate of the evidence only, or partly of facts and partly of the evidence, (for it cannot be regarded as containing a certificate only of facts, the statements of some of the witnesses as to material matters being in conflict), we are of opinion that the evidence was insufficient to warrant the verdict of the jury, and, therefore, that the judgment of the court below must be reversed, the verdict of the jury set aside, and the cause remanded for a new trial.