399 S.E.2d 851

**STATE of West Virginia**

v.

**John W. GILBERT.**

No. 19449.

Supreme Court of Appeals of West Virginia.

July 25, 1990.

---

Rudolph L. diTrapano, Lonnie C. Simmons, DiTrapano & Jackson, Charleston, for John W. Gilbert.

Roger W. Tompkins, Atty. Gen., Thomas J. Gillooly, Sr. Deputy Atty. Gen., Charleston, for State of W.Va.

PER CURIAM:

This is an appeal by John W. Gilbert from an order of the Circuit Court of Summers County sentencing him to eight concurrent one-to-five-year terms in the State penitentiary on eight counts of third-degree sexual assault. On appeal the defendant claims that the evidence adduced was insufficient as a matter of law to support the convictions. He also claims that the trial court erred in admitting evidence of numerous acts of sexual misconduct unrelated to the charge in the indictment. He argues that the court reporter failed to make a complete transcript of the proceedings before the trial court, and his right to appeal is thus impaired. Finally, he claims that the court erred in instructing the jury. After reviewing the record, this Court can find no reversible error. The judgment of the Circuit Court of Summers County is, therefore, affirmed.

During the September, 1987 term of the Circuit Court of Summers County, the defendant was indicted on eight counts of sexual assault. The indictment was for acts which the defendant had allegedly performed in 1976, 1977, 1978, and 1979, some eight to twelve years previously. The as-

saults had allegedly occurred against J.G., the defendant's niece, who at the times in question was under sixteen years of age.

The defendant was tried between February 16 and February 24, 1988. The State's principal witness was J.G. J.G. testified that, commencing when she was seven years old, she spent time each summer visiting the defendant, who was her uncle, and her aunt in Summers County. These summer visits began about June 15 and ended on or about July 15. She further testified, over the defendant's objection, that when she was ten years old, in June or July, 1974, some two years before the first act charged in the indictment, the defendant fondled parts of her body and made her touch parts of his body.

Before allowing this testimony, the trial judge asked counsel to approach the bench, and an off-the-record discussion was held. It is reasonable to infer that some discussion of the propriety of this testimony, which involved an improper act other than the acts charged in the indictment, occurred, but the court reporter did not transcribe or tape the conference.

Following the bench conference, the trial court gave a cautionary instruction to the jury stating that evidence of any incidents occurring prior to June, 1976, or after July, 1979, was not to be considered as evidence of the acts charged in the indictment, but was admissible "solely for the purposes of showing motive, intent, or a common plan or scheme."

J.G. proceeded to testify that when she was eleven years old, in June or July, 1975, the defendant again fondled her. Then when she was twelve, in June or July, 1976, the defendant made her touch his penis with her mouth, and the defendant placed his mouth on her vagina. She also testified that after the 1976 incidents she informed

her best friend, Maritza Lucas, of what had happened and told her to keep it a secret.

J.G. later testified that when she was thirteen in June or July of 1977, when she was fourteen in June or July of 1978, and when she was fifteen in June or July of 1979, the defendant made her engage in similar acts.

In questioning J.G. about the events which occurred in 1979, the State asked her about an incident involving the defendant's pet poodle, Peanut. The defendant objected; another off-the-record discussion was conducted; and J.G. was permitted to testify that while she was engaging in sex with the defendant, the defendant had interrupted the act and engaged in an act of beastiality with his pet poodle, Peanut.

Following this testimony, the trial court again instructed the jury that the evidence was to be admitted only to show motive, intent, or plan.

According to J.G., the event which persuaded her to file charges against the defendant occurred in June, 1987, when she was twenty-three years old. One day she was asked to deliver some medicine to the defendant at a car wash. When she delivered the medicine, the defendant asked her if she would even consider meeting him for weekends. J.G. became upset and resolved to record her next telephone call with the defendant.

In the telephone call which J.G. proceeded to record, and which was subsequently played to the jury during trial, the defendant made no direct statement indicating that he had ever committed any sexual act upon J.G. He, however, did make remarks from which a jury could have inferred that he did feel some sort of attraction for her and that he had been involved with her in the past.[1]

---

1. Typical portions of the conversation proceeded as follows:

 Victim: Lets just leave the past as it is.
 Defendant: Let me tell you something now J ..., like I told you before you know I, I don't want to create any problems and I know you don't want to create any problems and we don't have to create any problems you know, uh, it may never work, it may never happen,

but I enjoy talking with you and I've got remembrances that I can fantasize a little you know and uh, I'm getting to the age that just about all a man can do you know and the thing I like about you I know that in the past you've never said anything or done anything to imply anything and that, I admire in you, you're, you know, of course it was kind of a 2 way street with us you know.

During trial the State also adduced the testimony of Maritza Lucas, the victim's friend in whom the victim had confided regarding the 1976 incidents. Ms. Lucas verified that J.G. had told her about engaging in sexual acts with the defendant.

To counter the State's evidence, the defendant testified that he had never engaged in sexual misconduct with J.G. and that J.G. was never at his home in June or July of the years in question. He indicated that she always visited in August. He stated that while J.G. was at his home, the two of them were never alone for more than a few seconds. He further indicated that he was not the sort of person to do the sort of thing which she charged.

In his defense the defendant called at least eleven witnesses, who testified to his good character. Three of them testified that they had never known him to approach or contact a child sexually. One witness, Charlene Lugley, the defendant's sister-in-law, testified that the defendant had never sexually abused her children. Her daughter, Denise, testified in a similar manner. The grandchild of a neighbor testified in the same way. Both the defendant and his wife testified that he did not engage in sexual activity outside the marriage. There was also a denial of deviant sexual behavior.

The defendant also called witnesses who indicated that the defendant did not have an opportunity to assault or abuse J.G. during her summertime visits in his home. For instance, the defendant's daughter, Rhoda, testified that her father was never alone with little girls while she was growing up, and the defendant's son testified that every time the defendant was present with J.G., he, the son, was also present.

Apparently anticipating that the prosecution would attempt to rebut his character evidence, the defendant called as his own witness Debbie Wiseman, who had been his tenant. Ms. Wiseman, under defense counsel's questioning, testified that the defendant had, during a telephone call to her, described an act of beastiality with his dog. Ms. Wiseman also testified that the defendant had informed her that while he was in college, his roommate had performed an act of oral sex upon him. After adducing this testimony, the defendant attempted to discredit it, and the witness, by showing, among other things, that he had never attended college.

On rebuttal, the State called Norma Hoke. Ms. Hoke, who had also been the defendant's tenant, testified that in the spring of 1986 the defendant had walked into her apartment unannounced and placed his hands upon her breasts. Barbara McPherson, another rebuttal witness for the State, testified that while babysitting one night she had answered the telephone and recognized the defendant as the caller. The voice on the telephone had said that he was coming to visit her and that she was going to like it.

As previously indicated, the jury, at the conclusion of the evidence, found that the defendant guilty on all eight charges contained in the indictment. He was subsequently sentenced to from one-to-five years in the State penitentiary on each charge and fined $1,000 of each charge.

On appeal, the defendant argues that the evidence was insufficient, as a matter of law, to support the eight convictions of third-degree sexual assault. Essentially, he claims that the conviction was based solely on the uncorroborated testimony of

Victim: Well I just, I mean a lot of it, Uncle John, I was so young you know, I mean, I didn't know what was going on anyway.
Defendant: Yeah, you were curious, course I didn't, you know I didn't, I didn't.
Victim: Then I was scared too, you know.
Defendant: I didn't force you to do anything you know that.
Victim: Well its.
Defendant: Right?
Victim: Not physically, no, I mean you never said, you never said you'd harm me in any kind of way, but I mean its just being that young and all, it just scared me a lot, that's all.
Defendant. Yeah.
Victim: You know that's, I just, I'd just as soon let bygones be bygones, I don't want to hurt anybody. I mean I, it went too far anyway you know. I mean now that I'm old enough to realize what happened and all I just, I just want to forget everything.
Defendant: Well OK, if you want it that way, that's the way it will be.

the victim and that the evidence relating to the commission of the crimes charged was vague and amorphous and there were few specifics with regard to any of the facts and circumstances surrounding the alleged sexual assaults. He argues, for example, that J.G. was unable to give a specific date or place where any assault occurred and that the evidence, such as the fact that J.G. stayed at his house during the months of June and July, was contradicted by other evidence in the case.

In *State v. Beck*, 167 W.Va. 830, 286 S.E.2d 234 (1981), this Court addressed the question of what evidence is necessary to support a sexual assault conviction. In that case the Court indicated that West Virginia followed the majority position that a conviction for sexual assault may be had on the uncorroborated testimony of the female unless her testimony is inherently incredible. The Court also indicated that the question of her credibility is a question for the jury. The Court summarized the rule in syllabus point 5, as follows:

> A conviction for any sexual offense may be obtained on the uncorroborated testimony of the victim, unless such testimony is inherently incredible, the credibility is ordinarily a question for the jury.

In the *Beck* case, the Court affirmed a conviction based solely upon the testimony of a victim.

In the present case, J.G. testified that she visited her uncle in June and July of each year over a number of years. She also testified that, during the stays in the years when the charged offenses occurred, the defendant performed sexual acts with her. The victim's testimony fixed the acts to the time frames and locations contained in the indictment.

In his defense, the defendant denied ever committing sexual acts with the victim and, in effect, took the position that she was not a credible witness because he was not the type of person to engage in such acts and because the victim did not stay in his home in the time frame in question.

Even though the defendant suggests that the victim was not a credible witness and that he had never done acts of the type

claimed, in the 1987 conversation with the defendant, which was recorded and introduced into evidence, he made remarks from which the jury could have inferred that the victim, rather than he, was the credible witness. For instance, the defendant, in the conversation said:

> ... I enjoy talking with you and I've got remembrances that I can fantasize a little you know and uh, I'm getting to the age that just about all a man can do you know and the thing I like about you I know that in the past you've never said anything or done anything to imply anything....

At another point, when the victim indicated that she had been scared in the past, the defendant indicated that he did not force her to do anything.

This Court believes that, from an evidentiary point of view, the jury in the present case was faced with the task of determining the credibility of the witnesses. Contrary to the defendant's assertions, there was evidence that he committed sexual acts with J.G. at the times and in the places charged in the indictment. The fact that the witnesses for the defendant suggested that J.G.'s testimony was not credible did not preclude the jury from considering it. Overall, the Court believes that the evidence was sufficient to support the convictions and that the defendant has failed to show a sufficient basis for reversal on this ground.

The defendant's next claims that the trial court erred in admitting the evidence of collateral acts of sexual misconduct, acts which were unrelated to the charges in the indictment.

The evidence of the collateral acts about which the defendant complains was introduced at various points in the trial and in different ways. For instance, the victim, J.G., while she was testifying, indicated that prior to the first sexual assault charged in the indictment the defendant had fondled her in 1974 and 1975. Next, in describing the sexual assault which occurred in 1979, J.G. was permitted to testify to acts which the defendant performed

with his dog, Peanut. Third, the defendant complains about Debbie Wiseman's testimony relating to his telephone conversation with her about his acts with his dog and further about her testimony regarding his acts with his male roommate in college. Lastly, the defendant complains about the trial court's admitting the testimony of Norma Hoke and of Barbara McPherson on rebuttal.

In this Court's view, different legal principles govern the admission of the various points of evidence relating to collateral acts involved in this case.

The first collateral acts about which the defendant complains are those which he allegedly engaged in with J.G. in 1974 and 1975, prior to the date of the first sexual assault alleged in the indictment. The trial court admitted the evidence of this activity on the ground that it tended to show motive, intent, or common plan or scheme after conducting an *in camera* hearing on its admissibility. In allowing the admission, the court also gave a cautionary instruction to the jury that the evidence of the events was not admissible to establish the acts charged in the indictment, but was admissible solely for the purpose of showing motive, intent, or a common plan or scheme.

■ A principal case in this State relating to admission of such evidence is *State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986). In *Dolin*, the Court stated that, subject to exceptions, proof which shows or tends to show that the accused is guilty of the commission of other crimes and offenses at other times, even though they are of the same nature as the one charged, is inadmissible for the purpose of showing the commission of the particular crime charged unless such other offenses are an element of or are legally connected with the offense for which the accused is on trial. In reaching this conclusion, the Court followed the principles set forth in *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974). The Court moreover recognized that:

> "The exceptions permitting evidence of collateral crimes and charges to be ad-

missible against an accused are recognized as follows: the evidence is admissible if it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; and (5) the identity of the person charged with the commission of the crime on trial." Syllabus Point 12, *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974).

Syllabus point 2, *State v. Dolin, supra.*

■ Importantly, in *Dolin* the Court outlined procedural guarantees that must be followed before evidence of collateral crimes may be presented to a jury under the exceptions enumerated in syllabus point 12 of *State v. Thomas, supra.* The Court stated:

> Before a trial court can determine that evidence of collateral crimes is admissible under one of the exceptions, an *in camera* hearing is necessary to allow a trial court to carefully consider the admissibility of collateral crime evidence and to properly balance the probative value of such evidence against its prejudicial effect.

Syllabus point 3, *State v. Dolin, supra.*

■ It appears that in the present case, the trial court followed the procedural guidelines set forth in *Dolin* before allowing the victim to testify to the sexual acts which occurred before the offenses charged in the indictment, and at the conclusion of the *in camera* hearing, the court concluded that the evidence of the defendant's conduct in 1974 and 1975, before the acts charged, would tend to show motive, intent, or a common plan or scheme.

In this Court's view, the evidence tends to support the trial court's conclusion. The collateral crime evidence involved acts between the same parties, committed in the same place, and committed under the same general circumstances as the acts charged in the indictment. In allowing the admission of the acts, the trial court carefully cautioned the jury that the evidence of the collateral acts was not to be considered as

evidence of the defendant's guilt of the crimes charged, but was to be considered only as it reflected on motive, intent, the absence of mistake or accident, or a common scheme or plan. Under the circumstances, the Court cannot conclude that the defendant has demonstrated that the trial court committed reversible error by allowing the evidence.

■ The victim's testimony relating to the defendant's activities with the dog, Peanut, raises a slightly different question. The activity testified to by the victim occurred in the course of one of the sexual assaults alleged in the indictment. According to the victim's testimony, at the time the defendant initiated the activity with Peanut, the victim was engaged in sex with him. The activity with Peanut was integrally connected in time and place with the sexual activity out of which one of the counts against the defendant arose.

It has been recognized that evidence of collateral conduct may be admitted "[t]o complete the story of the crime on trial by placing it in the context of nearby and nearly contemporaneous happenings. The phrases 'same transaction' or, less happily, 'res gestae' often are used to denote evidence introduced for this purpose." *McCormick on Evidence* 3d § 190, pp. 558–59 (1984). Under this rule, J.G.'s testimony relating to the defendant's acts with Peanut would be admissible. In note 2 of *State v. Spicer*, 162 W.Va. 127, 245 S.E.2d 922 (1978), this Court recognized this rule and further stated that it was uniformly followed in other jurisdictions.

■ The third area of collateral evidence that the defendant challenges is the testimony of Debbie Wiseman relating to his telephone call describing bestiality with his dog and also her testimony relating to his sexual acts with his male college roommate.

A careful examination of the record shows that the State did not initially adduce Ms. Wiseman's testimony on these points. Rather, Ms. Wiseman testified as the defendant's own witness and under questioning by the defendant's own attorney. It appears that the testimony was adduced so that defense counsel could subsequently impeach Ms. Wiseman and destroy her as a potential rebuttal witness for the State. Specifically, the defendant's attorney proceeded to demonstrate that the defendant had never been to college and thus could not have engaged in sexual activity with a college roommate as indicated by Ms. Wiseman.

Under the circumstances, where the defendant himself called the witness and adduced the offending testimony, this Court believes that the defendant waived any standing to object to the admissibility of this evidence. *See State v. Smith*, 178 W.Va. 104, 358 S.E.2d 188 (1987); *State v. England*, 180 W.Va. 342, 376 S.E.2d 548 (1988).

■ Lastly, the defendant claims that the trial court erred in allowing the testimony relating to collateral acts given by Norma Hoke and Barbara McPherson.

As previously indicated, the defendant called a large number of character witnesses, who stated that he had a good reputation in the community for truth and veracity. In addition to this evidence of general character, the defendant also called witnesses who showed he had a specific moral character in regard to sexual activity. For instance, Charlene Lugley testified that she had never received any report from anyone that the defendant had engaged in any sort of improper activity with any children. Denise Lugley, another witness, testified in essentially the same manner. The defendant's wife testified that the defendant never had and never would engage in the type of conduct charged.

The testimony of Ms. Hoke and Ms. McPherson was subsequently introduced by the State to rebut the defendant's specific character evidence.

In *State v. Jackson*, 181 W.Va. 447, 383 S.E.2d 79 (1989), the Court discussed the admissibility of collateral crime evidence in the rebuttal context. The Court essentially indicated that, when general character evidence is adduced, rebuttal character witnesses may testify only as to the reputation of the defendant. Rebuttal testimony pertaining to specific acts is not allowed. However, the Court further suggested that

where evidence of a specific character trait is admitted in behalf of a defendant, then the State may rebut the specific evidence with evidence of specific acts. This is in line with the provisions of Rule 405(b) of the West Virginia Rules of Evidence.

This Court believes that, by attempting to show that he had a specific good character trait insofar as sexual morality goes by adducing the testimony of the Lugleys and his wife, the defendant opened up the subject of his sexual morality to rebuttal and that the testimony of witnesses Hoke and McPherson was within the scope of that rebuttal.

 In addition to challenging the collateral act evidence, the defendant argues that he was denied his right to a complete transcript for appeal when the court reporter failed to transcribe or record the bench conferences conducted in the case.

After examining the record of this case, this Court finds that at points the court reporter transcribed substantial portions of exchanges and arguments which took place out of the jury's presence. There is no indication that at any point defense counsel was prevented from making any record which he chose to make. There is further no indication that defense counsel at any point objected to the failure of the court reporter to transcribed what was occurring.

In syllabus point 17 of *State v. Thomas, supra,* this Court stated that:

> As a general rule, proceedings of trial courts are presumed to be regular, unless the contrary affirmatively appears upon the record, and errors assigned for the first time in an appellate court will not be regarded in any matter of which the trial court had jurisdiction or which might have been remedied in the trial court if objected to there.

Because of the lack of an objection on defense counsel's part to the failure of the court reporter to transcribe matter which occurred off the record, and because this Court cannot find that the defendant has affirmatively shown that the proceedings were irregular, this Court concludes that the defendant's assignment of error on this point is without merit.

 Lastly, the defendant claims that the trial court erred in instructing the jury regarding the inferences which might arise from the defendant's attempt to persuade a witness to testify falsely or not to testify. The State requested the instruction because there was evidence that the defendant had asked Debbie Wiseman to testify that she did not know anything and to deny that he had ever called her.[2]

Defense counsel objected to the instruction on the ground that there was no credibility question involved, but did not object on any other ground.

On appeal, the defendant claims that the instruction unfairly drew attention to Ms. Wiseman's testimony and that by failing to name Ms. Wiseman it was drawn too broadly.

In syllabus point 3 of *State v. Gangwer,* 169 W.Va. 177, 286 S.E.2d 389 (1982), this Court stated that:

> The general rule is that a party may not assign as error the giving of an instruction unless he objects, stating distinctly the matters to which he objects and the grounds of his objection.

The idea behind requiring such a rule is that the trial court be afforded an opportunity to address a particular objection.

The record indicates that the defendant did not object before the trial court on the grounds which he now raises on appeal. Because of this, the Court believes that the defendant's allegation on appeal is without merit.

For the reasons stated, the judgment of the Circuit Court of Summers County is affirmed.

Affirmed.

---

**2.** The instruction stated that if the jury believed that the defendant had attempted to persuade a witness to testify falsely or not to testify, that circumstance could be considered as a circumstance indicating his consciousness of guilt. It was modelled on principles enunciated by this Court in *State v. Weissengoff,* 89 W.Va. 279, 109 S.E. 707 (1921).